## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VONDA REESE,                                    )
                                                )
                  Plaintiff,                    )
                                                )
            vs                                  )        Civil Action No. 3:21-0003
                                                )
NORTHWEST BANK, et al.,                         )        Magistrate Judge Patricia L. Dodge
                                                )
                  Defendants.                   )

## <u>MEMORANDUM OPINION</u>

Plaintiff Vonda Reese ("Reese") brings this action against her former employer, Northwest Bank and its parent company, Northwest Bancshares, Inc. ("NBI") (together, the "Northwest Defendants"), as well as Central Regional President Jonathan E. Rockey ("Rockey") and District Managers Michael J. McAndrew ("McAndrew") and Debra S. Bender ("Bender") (at times referred to collectively as the "Individual Defendants"). The claims arise out of events that occurred during Reese's employment at Northwest Bank, culminating in her termination on November 26, 2019 and the cancellation of her stock options.

Reese asserts claims of sex and age discrimination, hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (Title VII), the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-34 ("ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 ("PHRA"), as well as related state-law claims of breach of contract and violation of the Pennsylvania Wage Payment and Collection Law, 43 P.S. §§ 260.1 to 260.10 ("WPCL").

Pending are Defendants' motion for summary judgment and Reese's motion for partial summary judgment. For the reasons below, Defendants' motion will be granted in part and

denied in part and Reese's motion will be denied.[1]

## I.    **Relevant Procedural History**

Reese commenced this action in January 2021. Subject matter jurisdiction is based on the federal civil rights claims, 28 U.S.C. §§ 1331, 1343(a)(4); 29 U.S.C. § 626(c)(1), and supplemental jurisdiction is asserted over the related state-law claim, 28 U.S.C. § 1367(a).

The Complaint alleges that Northwest Bank discriminated against her on the basis of her sex, subjected her to a hostile work environment and retaliated against her in violation of the Title VII (Count I); Northwest Bank discriminated against her based on her age, subjected her to a hostile work environment and retaliated against her in violation of the ADEA (Count II); Northwest Bank and the individual Defendants discriminated against her on the basis of her sex and age, subjected her to a hostile environment and retaliated against her in violation of the PHRA (Count III);[2] and the Northwest Defendants breached their contractual duties (Count IV) and violated the WPCL (Count V) when they cancelled her stock options.

On November 18, 2022, after discovery was completed, Defendants moved for summary judgment (ECF No. 48), which has been fully briefed (ECF Nos. 50, 67, 79, 82). The same day, Reese moved for partial summary judgment with respect to Counts IV and V (ECF No. 51), which has also been fully briefed (ECF Nos. 52, 60).

## II.    **Material Facts in Dispute[3]**

Reese was employed by Northwest Bank from April 1987 until November 26, 2019. In 2015, she became the Cash Management Advisor ("CMA") for the Central Region. Her duties

---

[1] The case was reassigned to the undersigned on April 1, 2025. The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). See ECF Nos. 88, 92.

[2] Unlike the federal discrimination laws, the PHRA contains an "aiding and abetting" provision that extends liability to individual defendants. 43 P.S. § 955(e).

[3] These facts are taken from the parties' concise statements and responses thereto, totaling six versions in all, but only to the extent that they are referenced in their briefs.

included serving as internal business partner to the Bank's branch managers, calling officers and commercial officers to assist in the sale of treasury products and services to businesses and to develop expertise in those areas. (Defendants' Concise Statement of Material Facts ("DCSMF") ¶¶ 1-3) (ECF No. 49); Plaintiff's Concise Statement of Material Facts Precluding Summary Judgment ("PCSMFPSJ") ¶¶ 5, 9-11) (ECF No. 69.)

Reese states that she has been described by other Northwest Bank employees as "very professional," "helpful," and "consistently enthusiastic and positive." She excelled at her job, was promoted several times and in 2017 and 2018 her annual reviews rated her overall performance as "distinguished," the highest rating given by the Bank. (PCSMFPSJ ¶¶ 17-18. ) In her 2018 review, she received a "commendable" rating with "distinguished" performance related to her annual "goals." (PCSMFPSJ ¶ 65.)

Defendants note, however, that in February 2013, after Reese passed around videos of topless females on her phone at an employee luncheon, she received a Notice of Disciplinary Action ("NDA") for inappropriate/unprofessional behavior and violating the code of conduct. (DCSMF ¶ 46.) On February 17, 2016, Reese received a negative performance notation for failure to follow the guidelines outlined by her supervisor. (DCSMF ¶ 47.)[4]

---

[4] Reese contends that her disciplinary history and conduct before August 1, 2019 was not a reason for her termination and that neither the February 2013 discipline nor the February 2016 notation has any bearing on this case. She notes that Steven Crissey ("Crissey"), Northwest Bank's Senior Vice President of Employee Relations between 2016 and 2019, testified that he was the sole decisionmaker for terminating Reese's employment and that, before August 1, 2019, no one was contemplating her termination. (PRDCSMF ¶¶ 46-47.) However, it is Northwest Bank's position that her prior misconducts were taken into account following an incident on August 1, 2019 that is described below, and so these facts are material. Reese contends that Defendants' explanation that they relied on her prior misconducts is pretextual or contrary to the Bank's usual process, as discussed below.

1.  <u>Reese's relationship and interactions with Bender and McAndrew</u>

McAndrew and Bender were District Managers for the Central Region. Reese, McAndrew and Bender were peers, and either McAndrew or Bender was tasked to evaluate Reese's performance and conduct. All three of them reported directly to Rockey, who was the Regional President for Northwest Bank from 2006 until his retirement in 2020. (DCSMF ¶¶ 4-7; PCSMFPSJ ¶¶ 6-8, 12-13.)

Northwest Bank had two Advisory Boards in the Central Region: Western (overseen by Bender) and Eastern (overseen by McAndrew). According to Defendants, Reese was invited to some of these meetings but did not attend. (DCSMF ¶¶ 29-35.) Manager meetings took place monthly and business partners, such as Reese, were invited to attend the morning session, stay for lunch, and depart after lunch so that only managers remained for the afternoon session. McAndrew added a notice to the agenda to remind business partners that they were to leave the meetings after lunch. Despite this notice, Reese had to be told to leave a manager meeting after lunch. (*Id.* ¶¶ 38-40.)

Disputing some of these facts, Reese asserts that Bender invited her to only one Western Advisory Board meeting. She asked Rockey for permission to attend other meetings and he would promise to "get her there," but would not do so, and that other, non-CMA, non-Treasury Management business partners often attended these meetings. She attended both the morning and afternoon sessions of manager meetings until McAndrew changed the agenda to reflect that business partners were not invited to stay for the afternoon sessions. She claims that this was done specifically to exclude her. Bender would prompt her to leave. (Plaintiff's Response to Defendants' Concise Statement of Material Facts ("PRDCSMF") ¶¶ 33-34, 37-40.) When McAndrew, without consulting Rockey, excluded Reese from manager meetings, Bender praised

him, writing that she "loved the manager's meeting agenda where you warded [off Reese] for the afternoon. Hope she can read. We'll handle her ourselves…." (*Id.* ¶¶ 29, 30, 34, 48.)

According to Reese, Bender and McAndrew secretly detested her because she did not conform with their gender stereotypes. They viewed her as "dominant," too "dramatic," "aggressive," "assertive," "too outspoken," and as talking "too much." (PCSMFPSJ ¶¶ 20, 25.) They frequently communicated insults about Reese to each other and were infuriated that Reese voiced opinions rather than sitting quietly in meetings. (*Id.* ¶ 24, 36, 42.) They wanted to "put her in her place" (*id.* ¶¶ 43, 44) and for her to be fired (*id.* ¶¶ 43, 82, 98), and conducted a secret campaign to undermine and get rid of her. (*Id.* ¶¶ 21, 26, 30, 34, 37, 44, 45, 48, 52-58, 71, 101.)[5]

Reese claims that McAndrew and Bender denigrated her to subordinates (*Id.* ¶¶ 26, 37, 39, 46) and used their managerial authority to isolate her in the Central Region. They prevented Reese from getting weekly operations updates she requested to help her do her job, even though it was acceptable for her to have them. (*Id.* ¶¶ 31, 33, 34, 107.) McAndrew and Bender disagreed with Rockey's supervision of Reese, which they viewed as "coddling," and fed Rockey false and slanted complaints to poison their relationship and cause Reese to be disciplined. (*Id.* ¶¶ 37, 42, 45, 52-59, 61, 66, 71, 82.) They encouraged other employees to complain. (*Id.* ¶ 26.)[6]

Defendants dispute some of these statements. In particular, they contend that Bender and McAndrew were admittedly "frustrated" with Reese but their feelings had nothing to do with her age or gender, and they state that the information Reese sought was sent to managers, not

---

[5] As discussed below, most of the comments shared between Bender and McAndrew were unknown to Reese until discovery was conducted.

[6] Defendants claim that "The evidence Reese cites does not support the contention in Paragraph 26." (Defendants' Response to Plaintiff's Concise Statement of Material Facts Precluding Summary Judgment ("DRPCSMFPSJ") ¶ 26.) However, she accurately quotes from an email in which Bender announced that Reese "needs someone strong to knock her down a few pegs." (ECF No. 70-52 at NWB005422.)

business partners. (DRPCSMFPSJ") ¶¶ 21, 29-31, 42-44, 48, 52) (ECF No. 78.) They also dispute that Bender and McAndrew contributed to the information in Reese's review. (*Id.* ¶ 71.)

Reese describes the Central Region as a "boys club" in which Rockey and McAndrew treated men better than women and in particular, older women were "under the microscope." She claims that they nitpicked and drove out multiple women in their 50s and 60s. (PCSMFPSJ ¶¶ 14-16.) While Defendants dispute this description as unsupported (DRPCSMPFJ ¶¶ 14-16), a declaration by Elizabeth Walker, a former office manager at Northwest Bank, states that when complaints were made, Rockey and McAndrew supported men rather than women. Further, according to Walker, she was required to work long hours and had to bid on positions while men simply received them. After she resigned because she experienced false accusations and heightened scrutiny, the man who obtained her position received resources that were denied to her and was not required to work on Saturdays. (Walker Decl. ¶¶ 6-9, 11, 15-17) (ECF No. 75-9.) Nevertheless, as Defendants note, Walker's statement that the Central Region was a "boys club" is her opinion and her statement that Rockey and McAndrew "drove out multiple women in their 50s and 60s" is neither supported nor are the women identified.[7]

According to Defendants, Reese is unsure whether the conduct she witnessed or heard about was directed toward these managers because they were female. (DCSMF ¶¶ 41-42, 44.)[8]

---

[7] As discussed below with respect to Reese's evidence, Walker's declaration might support a claim for sex discrimination, but her allegations, which are primarily that she was denied a position given to a less qualified male candidate, do not support a claim of a sexually hostile work environment.

[8] Defendants state that "none of the four female employees were not (sic) business partners or CMAs, like Reese." (DCSMF ¶ 43.) As Reese notes in her response, however, this statement is immaterial because Northwest Bank's misconduct policy applies to all employees, regardless of position. (PRDCSMF ¶ 43.) While Defendants note that Reese did not report the alleged treatment that she witnessed and heard about regarding these four female employees to Human Resources (DCSMF ¶ 45), they do not contend that Reese had a duty to report such incidents.

2. Social Activities at Northwest Bank

Reese claims that she faced a "hostile work environment created by Defendants' acts of favoritism towards male employees and hostility toward her and other female employees in the Central Region." (DCSMF ¶ 13.) Reese believes this favoritism was displayed through her purported exclusion from Northwest Bank-sponsored social activities like golf outings, shooting events, and holiday get-togethers. (DCSMF ¶ 14.)

As Defendants point out, Reese does not play golf or shoot clay pigeons, but women who did participate in these activities were invited to these events, which were not sponsored by Northwest Bank. (DCSMF ¶¶ 16-21.) Reese claims that there were other social activities from which she was excluded and that Rockey paid for other women to take golfing lessons but did not extend this offer to her. (PRDCSMF ¶¶ 14-15, 17, 20.)[9]

3. Reese's Reviews, Behavior and Disciplinary Actions

a. *March 1, 2019 meeting*

On March 1, 2019, Reese met with Rockey and Sarah Payne ("Payne"), who was the Human Resources Officer ("HRO") for Northwest Bank's Northwest and Southwest Regions and reported to Rockey. Reese was presented with another NDA[10] for violation of company policies and procedures and inappropriate and unprofessional behavior. (DCSMF ¶ 48.) Reese notes that an NDA is the lowest form of progressive discipline and she refused to sign the review because she did not believe there was a "policy/procedure violation." (PCSMFPSJ ¶¶ 60-62.)

The NDA stated that there were continuing concerns about Reese's adherence to management directives as well as a lack of contributions to a positive work environment.

---

[9] As explained below, however, she does not reference these issues when addressing her hostile work environment claim.

[10] As previously discussed, Reese had also received an NDA in 2013.

(DCSMF ¶ 49.) Reese questioned why a box on the NDA was checked that reflected a violation of company policies and procedures. (*Id.* ¶ 50.) Defendants state that Payne told Reese that she would look into her question about the NDA, and subsequently removed the check from the box. (*Id.* ¶ 51.) Reese disputes that this was done. (PRDCSMF ¶¶ 48, 51.)

Reese disagreed with portions of the review, which came from Bender and McAndrew, and stated during the meeting that she worked in a "hostile work environment," was bullied and felt excluded. (PCSMFPSJ ¶¶ 53, 56, 60-62, 65.)

Reese also mentioned during this meeting that she wanted to pursue the Certified Treasury Professional ("CTP") test. (DCSMF ¶ 79.) Previously, in December 2018, Shawn Walker ("Walker"), the Northwest Bank employee overseeing business service advisors at the time, including CMAs, had discussed the CTP process at a meeting where all CMAs were present. (*Id.* ¶ 85.) Walker told the group that CMAs should try to get ten years of benefit out of the CTP designation and so CMAs should not wait until they were about to retire to take the CTP exam. (*Id.* ¶ 86.)[11] Defendants state that, at each of her prior annual performance review meetings, Reese mentioned her desire to take the CTP test, and Rockey was supportive. (*Id.* ¶ 82.)

Thus, when Reese brought up the CTP test again during the March 1, 2019 meeting, Rockey alluded to Walker's comments and emphasized that Reese should not wait until she was close to retirement to take the test. (DCSMF ¶ 90.) Reese responded to Rockey's comment by asking "how old do you think I am?" (*Id.* ¶ 91.) Rockey responded that he believed Reese was 53

---

[11] Reese disputes that the evidence Defendants cite specifically reflects that she was present at the meeting at which Walker spoke. (PRDCSMF ¶¶ 85-86.) The cited testimony is from Rockey's deposition (ECF No. 49-1 Ex. 3 at 196-97) and concerns a conversation Rockey had with Walker. Whether Reese was present at the meeting was not discussed.

years old. (*Id.* ¶ 92.) Defendants claim that Rockey did not believe that Reese was too old to start the CTP process; rather, he was concerned that Reese had been talking about taking the CTP test since she started reporting to him but had taken no steps to start the process. Rockey never told Reese that she could not pursue the CTP designation and that if Reese wanted to start the CTP process, she could have applied and Rockey would have approved it. (*Id.* ¶¶ 93-96.)[12]

Reese disputes this version of events, claiming that Rockey did not express support for her taking the CTP test in March 2019 and Payne's detailed notes of the meeting do not reflect any statement of encouragement. According to Reese, Rockey made comments about her age in connection with the CTP exam on at least one other occasion and she felt that going forward without Rockey's express permission would disregard Northwest Bank's application process. Because Rockey did not give his consent, she missed the May 10, 2019 deadline to apply for the summer exam and would be unable to apply again until the winter testing window. (PRDCSMF ¶¶ 82, 89-90, 93-96; PCSMFPSJ ¶¶ 72-73.)

Payne testified that Rockey's comment "went to age" and that Reese could have interpreted it as age discrimination. (PCSMFPSJ ¶¶ 79-80.)[13]

### b. *Reese's Complaints after the March 1, 2019 meeting*

Following the meeting, Rockey and Payne tried to schedule another meeting with Reese to discuss next steps for the CTP and express their support of her pursuing it. Reese declined to meet and asked to table discussions about the CTP. (DCSMF ¶ 98, 102.). As a result, Defendants

---

[12] When asked at her deposition if anyone told her she could not take the CTP, Reese testified "that's correct, nor did they say I could take it." (Reese Dep. 97:22-23) (ECF No. 49-1 at 45.)

[13] Defendants dispute "that Payne testified that she understood Rockey's comment at the March 1, 2019 meeting 'went to age' within the portion of the record cited by Reese." (DRPCSMFPSJ ¶ 79.) They are technically correct. Reese cites Payne's deposition at pages 47-48; the "went to age" comment appears at the bottom of page 46.

assert, Reese knew Northwest Bank supported her in her decision to pursue the CTP test. (*Id.* ¶ 103.). However, she never submitted an application to pursue the CTP designation. (*Id.* ¶ 104.)

On the other hand, Reese contends that she did not abandon the CTP test, but only requested to "table" the topic while they addressed issues about her performance review. The testimony cited by Defendants reflects that she did not become aware until July 2019 that the Bank would support her taking the CTP test. (PRDCSMF ¶¶ 102-04.) In a March 4, 2019 follow-up call, she complained to Payne about Rockey's age-related comment about the CTP exam and requested a meeting with Crissey. (PCSMFPSJ ¶¶ 83-84.) According to Defendants, however, Reese stated she "doesn't want a meeting right away." (DRPCSMFPSJ ¶ 84.)

Crissey and Rebekah Moore ("Moore"), the HRO for the Central Region, met with Reese on May 7, 2019. (DCSMF ¶¶ 106-07.)[14] Crissey was Northwest Bank's employee relations manager from 2016 to 2019. (PCSMFPSJ ¶ 201.) His responsibilities included "overseeing employee relations," "applying the disciplinary process" to employees across the Bank and enforcing nondiscrimination laws. (PCSMFPSJ ¶ 202.) He had five or six reports, including HROs Moore and Payne, who he supervised and "directed . . . in certain instances on how to resolve issues. . . . And . . . from time to time [Crissy would] get directly involved." (PCSMFPSJ ¶¶ 204-05.)

Crissey was made aware during the May 2019 meeting of Reese's belief that Rockey denied her the opportunity to pursue the CTP test because of her age. (DCSMF ¶ 110.) Reese also brought up complaints about her annual performance review and the March 1, 2019 NDA. Reese mentioned Title VII, claimed she was being discriminated against by Rockey, McAndrew

---

[14] Although Reese complains that Crissey did not meet with her for two months after she requested the meeting (PCSMFPSJ ¶ 89), she does not dispute that Crissey was on disability leave during this time (DRPCSMFPSJ ¶ 89.)

and two other employees, and said that she believed other female employees had been driven out of the Central Region. (DCSMF ¶ 112; PCSMFPSJ ¶¶ 90-91.) According to Defendants, when Crissey requested additional details about Reese's complaints about women being driven out of the Central Region, she was unwilling to provide any specific details. (DCSMF ¶ 113.) Crissey concluded the discussion by explaining that they would investigate and look into Reese's concerns. (DCSMF ¶ 114.)

In June 2019, in a follow-up call to the discussion on May 7, Crissey and Julia McTavish, former Senior Executive Vice President, spoke with Reese to tell her that they were supportive of her taking the CTP test, and to provide dates in the near future that she could register. (DCSMF ¶ 116.) Reese was told that she could begin the CTP curriculum in September 2019 and upon completion could take the CTP exam. (DCSMF ¶ 117.) Reese again declined the opportunity. (DCSMF ¶ 118.) During this conversation, Crissey also informed Reese that they were willing to revise the March 1, 2019 NDA to remove the reference to violations of company policies and procedures. (DCSMF ¶ 119.)

After resolving Reese's complaints about the CTP test and the March 1, 2019 NDA,[15] Crissey asked Payne to investigate whether Reese's annual performance review and the March 1, 2019 NDA were discrimination, harassment, and/or retaliation because Reese had raised concerns previously. (DCSMF ¶ 121-22.) As part of the investigation, Payne conducted interviews of twelve employees between July 23 and July 27, 2019. (DCSMF ¶ 124.) Payne found no information or evidence to support Reese's claims of discrimination, harassment or retaliation . (DCSMF ¶ 125.) However, Payne did learn that Reese's relationships with other employees were strained because she was aggressive, pushy, and loud in her interactions with

---

[15] Reese asserts that she did not abandon taking the CTP exam and disputes that Northwest Bank "resolved" her concerns.

coworkers. (DCSMF ¶ 126.)

According to Reese, Payne neither interviewed her nor did she understand the nature of her claims, and Payne's account of the interviews is hearsay. (PRDCSMF ¶¶ 118, 121-22, 125-26.) Reese again complained of harassment and being subjected to a "witch hunt." (PCSMFPSJ ¶ 97.) Two days later, McAndrew told Rockey that he needed to "stop" Reese, who was "trying to set him up" along with Rockey and Bender, and that Reese "needs to go." (*Id.* ¶ 98.) Reese claims that HR did not investigate her complaint for months and when Payne finally interviewed Rockey, Bender and McAndrew in late July 2019, she focused on Reese's conduct, not on her complaints. Payne's notes reflect that Rockey said that portions of Reese's issues were that "she's older and [the management system] is harder to grasp and [she] doesn't want to give it the time to grasp it." (PCSMFPSJ ¶¶ 102-06.)

According to Defendants, Payne's investigation was focused on determining whether Reese's annual performance review and the March 1, 2019 NDA constituted discrimination, harassment or retaliation. They dispute that Payne did not understand what she was investigating. (DRPCSMFPSJ ¶¶ 103-04.)

On Friday, July 26, 2019, Payne emailed Reese to inform her that while Payne would be out of the office, Reese's complaints were being addressed, and Payne would follow up with her the week of August 5, 2019. (DCSMF ¶ 129.) Prior to Payne's return, Reese raised various issues at a meeting on August 1, 2019 with Rockey, Bender and McAndrew.

c. *August 1, 2019 incident*

On August 1, 2019, Bender, McAndrew and Rockey were holding their monthly Regional District Manager meeting and invited Reese to attend a portion of the meeting to discuss her year-to-date numbers, fee waivers and a presentation she was scheduled to give at the

upcoming Advisory Board meetings. (DCSMF ¶ 130.) After these topics were addressed, Rockey asked if there were any other issues to discuss. (*Id.* ¶ 132.) Reese stated that she wanted to go over her annual performance review. (*Id.* ¶ 133.) Defendants claim that Bender and McAndrew tried to leave the meeting because they were not responsible for her performance review, but Reese demanded that they stay. (*Id.* ¶ 134.) In turn, Reese claims that she asked that Bender and McAndrew stay because they had contributed information that Rockey had considered. Rockey then asked them to stay. (PRDCSMF ¶¶ 133-34; PCSMFPSJ ¶¶ 113, 115-16.)

Reese told them that she needed weekly operations updates, asked for assistance to get access and explained that Bender, McAndrew and Rockey "weren't giving her what she needed to do her job," but they opposed her requests. (PCSMFPSJ ¶¶ 117-20.) According to Defendants, however, these issues had already been addressed and Reese was told that she did not require this information since no other CMAs were receiving it. (DRPCSMFPSJ ¶¶ 118-20.)

Defendants claim that Reese then became visibly frustrated and upset and began crying. (DCSMF ¶ 140.) Reese got out of her seat, leaned over the table at McAndrew and pointed her finger at him while yelling "you've known me for 20 damn years, you know I wouldn't lie about this." (DCSMF ¶ 142.) Raising her voice, she pounded the table, yelled that the environment was hostile, and said that she was tired of playing defense and was "going on offense." (DCSMF ¶¶ 143-44.) Rockey, Bender and McAndrew claims that they felt that Reese was threatening them. (DCSMF ¶ 145.)

According to Reese, all of the participants agreed that Reese did not mention guns or threaten physical violence during this meeting. (PCSMFPSJ ¶¶ 137-38, 142-44.) Reese denies pounding on the table, yelling or screaming, taking an aggressive tone or threatening anyone.

13

(PRDCSMF ¶¶ 142-44; PCSMFPSJ ¶¶ 119-20, 137-38, 142-44.) When McAndrew said that they had another meeting to attend, she stated that she was not finished. Rockey invited her to plan another date and time to conclude the conversation, all of which is inconsistent with a claim that anyone felt threatened. Moreover, it was only later that Rockey, McAndrew and Bender asserted that Reese could have been threatening physical harm. She never stated that she intended to harm anyone. (PRDCSMF ¶ 145.) She was tired of being unfairly blamed and said she would go on the "offensive" meaning that she would take a more proactive approach when bringing issues to light so that they would not be taken out of context or misstated to her detriment. (PCSMFPSJ ¶¶ 125, 130-31, 133, 139, 142, 144-45.) When McAndrew said that he, Rockey, and Bender had another meeting, Reese stopped talking. Rockey asked if she wanted to reconvene, but Reese declined "at this time." (PCSMFPSJ ¶¶ 127-128.)

After the meeting, Bender was shaken and concerned that Reese would do something to her or go after her. (DCSMF ¶ 146.) McAndrew was very concerned and felt in imminent harm after the meeting because Reese raised her voice, demanded things, and was visibly upset. (DCSMF ¶ 147.)[16] Bender, Rockey and McAndrew agreed that her behavior had to be reported to Human Resources. (DCSMF ¶ 148.) Immediately after the meeting, Rockey reported Reese's behavior to Moore. (*Id.* ¶ 149.) Human Resources asked that Bender, Rockey and McAndrew provide written statements of what had occurred at the meeting. (*Id.* ¶ 152.)

The three statements written by Rockey, Bender and McAndrew that day stated that she had mentioned a hostile work environment, but none referenced safety concerns. Rather, Bender and McAndrew both felt that Reese would lodge more complaints and that McAndrew felt

---

[16] Reese counters that whether Bender was truly "shaken" or McAndrew was "very concerned" and "felt in imminent harm" are jury questions, particularly given the documented history of their animus toward her. (PRCDSMF ¶¶ 146-47.)

"threatened" by Reese's references to a hostile work environment. (PCSMFPSJ ¶¶ 148-52, 154-56.) Moore's notes from that day indicate that Bender "is particularly upset due to the statement of [Reese] being on the 'offense.' [Reese] is a well-known gun owner and she also has pistols. They are all concerned with that knowledge, but [Bender] is particularly concerned." (DRPCSMFPSJ ¶ 148.)

The next day, McAndrew, Bender and Rockey expressed additional concerns after having time to think through the previous day's encounter. (DCSMF ¶ 154.) McAndrew claims that he became scared overnight, and called Moore the morning of August 2, 2019, to express that he knew Reese had access to guns and he was concerned about what could happen next. (*Id.* ¶ 155.)

Reese disputes the credibility of these accounts. (PRDCSMF ¶¶ 154-55.) She contends that these individuals began to change their story into one in which she was falsely cast as a gun-obsessed, aggressive individual as a means to secure her termination. McAndrew called Moore and told her that he was now "legitimately 'freaked out' over [Reese's] reactions" and claimed that Reese "always talks about guns" and "speaks about them more and more." (PCSMFPSJ ¶¶ 148-51, 154, 160, 162-64.)[17]

### d. *Reese is placed on involuntary leave*

While issues about the August 1 meeting were being investigated, Crissey made the decision to place Reese on a paid leave of absence starting August 5, 2019. (DCSMF ¶¶ 156-57.)[18]

According to Defendants, on August 7, 2019, at Moore's request, Rockey, Bender and McAndrew each provided Human Resources with additional statements describing their ongoing

---

[17] Reese notes that McAndrew, Bender and Rockey regularly discussed guns with one another and with others at Northwest Bank. (PCSMFPSJ ¶ 174.)

[18] Reese responds that she was placed on involuntary leave on August 5, but only retroactively placed on paid leave after her counsel made this request on August 7. (PRDCSMF ¶ 157.)

concerns of what Reese might do because they each knew that she owned guns. (DCSMF ¶¶ 158-59)

Reese suggests that Defendants' timeline is misleading. Rather, *after* her counsel contacted Defendants' counsel on August 7, 2019, Moore, at Crissey's direction, requested information about "anything [Reese] has stated that made you concerned regarding her ownership of guns and any details you can recall regarding that or any other situation where you have felt unsafe." (PRDCSMF ¶¶ 158-59; PCSMFPSJ ¶¶ 166-69.) According to Reese, their statements recalled only one or two innocuous gun references over all the years they worked with Reese, and none had made them feel unsafe. (PCSMFPSJ ¶¶ 170-73.)

In fact, Rockey's statement referred to Reese's "erratic behavior," commented on a number of occasions that Reese told him she had weapons (the only personal information she ever shared with him), once stated that she is "an addictive person" and concluded as follows: "I will say the whole situation has me worried because I know she has weapons and crazy things are happening every day with weapons and I think she is unpredictable." (ECF No. 70-34 at NWB000775.)

Bender described how another employee commented that Reese should keep her blinds closed because people can look in her window and see her gun vault wide open with all of her collection. He also noted that Reese came to a meeting uninvited and was "entertaining" the board members with a story about the guns she was looking at when she stopped at a gun shop before the meeting and told them they sold bras that you can hide your gun in. He also called Reese "aggressive and unpredictable" and felt that "we will always need to be in pairs when meeting with her to protect our conversations and for personal safety reasons." He also relayed that Reese "may have some underlying health issues both physical and mental that may cause her

to take drastic measures" and concluded "I do not feel safe around her." (*Id.* at NWB000779.)

McAndrew referred only to a "few times" that Reese made remarks about guns she had at home but stated that "This coupled with her aggressive behavior towards me, [Rockey and Bender] last week makes me feel very concerned." (*Id.* at McAndrew000007.)

### e. *Comparators*[19]

All Northwest Bank employees are subject to its "Corrective Action" policy, which prohibits "threatening or violent behavior, bullying, [and] unlawful harassment." (PCSMFPSJ ¶ 207.) Reese contends, however, that in practice, older women such as herself and others were put "under the microscope" and driven out of the company, (PCSMFPSJ ¶¶ 14-16), while Crissey gave slaps on the wrist, referral to Employee Assistance Program ("EAP"), and emotional management trainings to male employees who engaged in unprofessional, threatening and/or violent behavior, often repeatedly. (PCSMFPSJ ¶¶ 210-11.) None of these men had filed discrimination or retaliation complaints against Northwest Bank, and each received lesser discipline than Reese or were not disciplined at all. (PCSMFPSJ ¶¶ 210-12.)

Defendants respond that Reese misrepresents the record about these other employees and fails to acknowledge that 29 other employees (male and female) were also terminated for engaging in inappropriate, unprofessional, threatening and/or violent conduct between January 2017 and May 2021. (DRPCSUMF ¶ 212.)

### f. *Termination of Reese's employment*

Defendants state that, during the week of August 5, 2019, and after receiving the August 7, 2019 supplemental statements for McAndrew, Bender and Rockey, Crissey recommended that Reese's employment be terminated. (DCSMF ¶ 164.) Before the termination decision became

---

[19] As relevant, specific comparators will be discussed at a later point in this opinion.

final and was communicated to Reese, however, Northwest Bank was contacted on August 7, 2019, by attorneys retained by Reese. (DCSMF ¶ 165.)

Reese disputes this sequence. On August 12, 2019, Reese filed a charge with the Equal Employment Opportunity Commission ("EEOC"). (DCSMF ¶ 166.) The same day, at Crissey's direction, Payne drafted a letter to Reese summarizing her investigation, but did not mention termination. (PCSMFPSJ ¶ 178.) The following Monday, Reese provided a copy of the EEOC charge to Richard Laws, Northwest Bank's general counsel, who shared it with Crissey. The next day, McAndrew texted Bender that "unofficially [Reese] was terminated" and "Laws is handling everything." (PCSMFPSJ ¶¶ 179-82.)[20] Reese then remained on administrative leave for four months. (*Id.* ¶ 185.)

A mediation took place on November 26, 2019 in an effort to resolve the issues with Reese's employment, but no resolution was reached. (DCSMF ¶ 167.) Defendants state that, after there was no resolution at mediation, Reese's employment was terminated on November 26, 2019, and classified as "for cause." (DCSMF ¶ 168.) According to Reese, however, Crissey verified in interrogatories that he made the decision to terminate her employment on September 11, 2019. (PRDCSMF ¶¶ 164, 168.)

Reese was informed of the reason for her termination in a letter from Crissey dated November 26, 2019. (DCSMF ¶ 169.) The letter stated that Northwest Bank determined that Reese "took over a meeting to address personal issues," and she "engaged in inappropriate, unprofessional and aggressive conduct toward [her] manager and coworkers." (DCSMF ¶ 170.) it also advised Reese that "in light of the fact that the need for professionalism in your internal

---

[20] McAndrew testified that Rockey had told him Reese was suspended and, in his experience, that likely meant that she would not be returning. (McAndrew Dep. 111:10-23) (ECF No. 78 Ex. 3.)

communications has been addressed with you in the past, in prior performance evaluations and through discipline," Northwest Bank was ending her paid administrative leave and terminating her employment effective November 26, 2019. (DCSMF ¶ 171.)[21]

Defendants assert that Bender, McAndrew and Rockey did not make the decision to terminate Reese's employment, nor were they consulted in the decision-making process about whether to terminate Reese's employment. (DCSMF ¶¶ 172-75.) Reese counters that their input was considered by the decision maker. (PRDCSMF ¶¶ 172-75.)

    4.  <u>Stock Options</u>

NBI sponsors non-ERISA equity incentive plans for the benefit of its employees and those of its subsidiaries. NBI adopted stock options plans in 2008, 2011 and 2018, and Reese was granted incentive stock options under the 2008, 2011, and 2018 equity incentive contracts. (Plaintiff's Concise Statement of Undisputed Material Facts ("PCSUMF") ¶¶ 5-9) (ECF No. 53); DCSMF ¶ 181.)

All three incentive plans provide that a termination "for cause results in the expiration and forfeiture of any award of stock options that was not previously exercised or vested. (DCSMF ¶ 182.) Between 2016 and May 2022, six other Northwest Bank employees were discharged for unprofessional behavior and had their incentive stock awards canceled based on the involuntary termination of their employment. (DCSMF ¶ 186.) Between 2016 and 2021, Crissey treated all involuntary terminations (other than reductions in force) as "for cause,"

---

[21] Reese objects to the admission of the November 26, 2019 letter, on the ground that it is inadmissible hearsay prepared in anticipation of litigation. She disputes that the reasons for her termination were anything other than her alleged behavior at the August 1, 2019 meeting. (PRDCSMF ¶¶ 169-71.)

irrespective of the terms of applicable incentive contracts. (PCSUMF ¶¶ 27-28.)[22]

On November 26, 2019, Crissey cancelled Reese's awarded but unexercised stock options under the 2008 and 2011 equity incentive contracts because Reese had been terminated "for cause." (PCSUMF ¶¶ 21-22, 24.) While Defendants state that Crissey relied on the terms of the incentive plans in doing so (DCSMF ¶ 184), their interrogatory responses state that Crissey relied only on the language of the 2018 plan.[23] Reese claims that Crissey only classified Reese's termination as "for cause" and canceled her stock options after attempts at mediation were unsuccessful. (PRDCSMF ¶ 185.)

"Cause" is defined in Section 8.1 of the 2008 Plan as follows:

(d) "Cause" means (i) the conviction of the Participant of a felony or of any lesser criminal offense involving moral turpitude; (ii) the willful commission by the Participant of a criminal or other act that, in the judgment of the Board, will likely cause substantial economic damage to the Company or any Subsidiary or substantial injury to the business reputation of the Company or any Subsidiary; (iii) the commission by the Participant of an act of fraud in the performance of his duties on behalf of the Company or any Subsidiary; (iv) the continuing willful failure of the Participant to perform his duties to the Company or any Subsidiary (other than any such failure resulting from the Participant's incapacity due to physical or mental illness) after written notice thereof; or (v) an order of a federal or state regulatory agency or a court of competent jurisdiction requiring the termination of the Participant's Service with the Company. Notwithstanding the foregoing, if the Participant is subject to a written employment agreement (or other similar written agreement) with the Company or a Subsidiary that provides a definition of termination for "Cause," then, for the purposes of this Plan, the term "Cause" shall have meaning [sic] set forth in such agreement.

(PCSUMF ¶ 32.)

---

[22] Defendants state this practice was "consistent" with the language of the incentive plans. (DCSMF ¶ 185.) Reese responds that Crissey admitted other outcomes were possible as it was within the Bank's discretion. (PRDCSMF ¶ 185.)

[23] Crissey first testified during his deposition that "I don't recall reviewing any of the plans specifically. I may have, but I don't remember doing that." (Crissey Dep. 79) He later testified that he relied only upon the 2018 incentive stock option award agreement. See ECF No. 54 Ex. 10 (Crissey's answers on behalf of Northwest Bank to interrogatories 8, 10); (Crissey Dep. 81-82.)

"Cause," is defined in Section 8.1 of the 2011 Plan as follows:

(e) If the Participant is subject to a written employment agreement (or other similar written agreement) with the Company or a Subsidiary that provides a definition of termination for "Cause," then, for purposes of this Plan, the term "Cause" shall have meaning [sic] set forth in such agreement. In the absence of such a definition, "Cause" means (i) the conviction of the Participant of a felony or of any lesser criminal offense involving moral turpitude; (ii) the willful commission by the Participant of a criminal or other act that, in the judgment of the Board, will likely cause substantial economic damage to the Company or any Subsidiary or  substantial injury to the business reputation of the Company or any Subsidiary; (iii) the commission by the Participant of an act of fraud in the performance of his duties on behalf of the Company or any Subsidiary; (iv) the continuing willful failure of   the Participant to perform his duties to the Company or any Subsidiary (other than any  such  failure  resulting  from  the  Participant's incapacity due to physical or  mental illness) after written notice thereof; or (v) an order of a federal or state regulatory agency or a court of competent jurisdiction requiring the termination of the Participant's Service with the Company.

(*Id.* ¶ 33.) Finally, under the 2018 plan, "cause" includes "termination because of a Participant's personal dishonesty, incompetence, willful misconduct, breach of fiduciary duty involving personal profit . . . intentional failure to perform stated duties . . . or material breach of any provision of the contract." (ECF No. 49-1 at 591 § 2.6(b).)

Reese asserts that she was not terminated because she failed to perform her Treasury Management Advisory duties. (*Id.* ¶ 36.) Defendants dispute this contention, noting that in February 2013, February 2016 and March 2019, she was given written notice and warned of the unprofessional manner in which she was performing her duties. Despite these warnings, she "took over a meeting to address personal issues" on August 1, 2019, and "engaged in inappropriate, unprofessional and aggressive conduct toward [her] manager and coworkers." As such, Defendants contend that her employment was terminated as a result of her "continuing willful failure . . . to perform [her] duties to the Company or any Subsidiary . . . after written notice thereof," which they contend included her ongoing and willful disregard of prior written directives to refrain from engaging in unprofessional behavior that did not promote a positive

work environment. (DRPCSUMF ¶ 36.)

Thus, because Reese was terminated for cause, Defendants contend that she forfeited all of her shares.

According to Reese, under the 2008 and 2011 plans, termination for any reason other than death, disability, retirement or for "cause" would provide her with three months to exercise her vested stock options. (PCSUMF ¶ 38.) She asserts that in interrogatory answers, Defendants did not identify any language from the 2008 or 2011 plans that supported their decision to cancel her stock options. (*Id.* ¶ 39.) She claims that they identified language only from the 2018 plan, and she is not seeking summary judgment with respect to this plan. (*Id.* ¶ 40.) Defendants note, however, that their interrogatory answer referred to a provision in the 2018 stock option award agreement indicating that if an employee's employment has been terminated "for Cause, all Options that have not been exercised will expire and be forfeited" (DRPCSUMF ¶¶ 39-40) (citing Section 9(iv), ECF No. 49-1 at 637.) Similar language appeared in the 2008 and 2011 plans in Sections 2.6(b) and 2.8(b), respectively. (ECF No. 49-1 at 572, 591.)

Reese states that both her expert and Defendants' expert used the same methodology to calculate the value of her lost stock options and concluded that the total was $14,144.00 as of November 26, 2019.[24] She initially asserted that she had 3,720 vested shares with a combined value of $14,087. However, she conceded in her response to Defendants' brief in support of their motion for summary judgment that because she should have relied on the actual vested stock options, not the overall "cancelled" incentive options, she only seeks the value of 2,136 shares. (Pl.'s Br. Opp'n at 33 n.13.)

---

[24] Defendants disagree, noting that their expert did not calculate the total value of her stock awards under the 2008 and 2011 plans but simply assumed the value consistent with Reese's expert's valuation.

Reese has also calculated liquidated damages under the WPCL in the amount of $3,521.75. (PCSUMF ¶¶ 41-46.) Defendants contend that she is not entitled to liquidated because there is a good-faith dispute about the Bank's nonpayment of any amounts due. (DRPCSUMF ¶¶ 41-46.)

III.    **Standard of Review**

The Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court of Appeals has held that "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's

favor. *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

The summary judgment rules do not apply any differently to cross-motions. *Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 310 (3d Cir. 2008). "'Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968)). If upon review of cross-motions for summary judgment the court finds no genuine dispute over material facts, then judgment will be entered in favor of the party deserving judgment considering the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

## IV.   <u>Discussion</u>

### 1.   <u>Employment Discrimination Claims</u>

Under Title VII, it is an unlawful employment practice for an employer to discharge or discriminate against any individual because of that individual's sex. 42 U.S.C. § 2000e-2(a)(1). In turn, the ADEA prohibits discrimination against employees over the age of 40. 29 U.S.C § 631(a). Discrimination on the basis of sex and age is also prohibited by the PHRA. 43 P.S. § 955(a).

As provided in Title VII, it is an unlawful employment practice to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Retaliation is similarly prohibited under the ADEA, 29 U.S.C. § 623(d), and the PHRA, 43 P.S. § 955(d).

In responding to a motion for summary judgment, a plaintiff alleging employment discrimination must first make out a prima facie case under the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). This usually involves a showing that the plaintiff belongs to the protected class, was qualified for the position, and was subjected to an adverse employment action under circumstances that raise an inference of discrimination. *Id. See also Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action.

If the defendant articulates such a reason, the burden then shifts back to the plaintiff to proffer evidence from which the trier of fact could conclude that this proffered reason is a pretext for unlawful discrimination. In that event, a plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). The employer's proffered reason cannot be a "post hoc fabrication." *Id.*

The same analysis is used for PHRA claims. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 n.3 (3d Cir. 2000) (sex discrimination); *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 972 (3d Cir. 1998) (age discrimination); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (retaliation).[25]

---

[25] As explained below, hostile work environment claims are evaluated differently.

2.  <u>Sex Discrimination Claims in Counts I and III</u>

In Count I, Reese alleges that in violation of Title VII, she was discriminated against based on her sex and was subjected to a hostile work environment. She alleges the same claims under the PHRA in Count III. Defendants move for summary judgment as to these claims.

a.  *Hostile Work Environment*[26]

A violation of Title VII may be established if a plaintiff can show that discrimination based on a protected characteristic created a hostile or abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). In order to succeed on such a claim:

> the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). *See also Faragher*, 524 U.S. at 786-87 & n.1. As held by the Supreme Court, courts are to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The same standards apply under the PHRA. *See Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001).

Defendants argue that Reese's allegations about a hostile work environment are factually unfounded, noting the following:

---

[26]Defendants argue in footnotes to their briefs that Plaintiff's Complaint does not set forth a separate claim for sexual harassment or hostile work environment, noting that the captions of Counts I and III do not use these terms. (Defs.' Br. at 13 n.6; Reply Br. at 2 n.2.) As Reese states in her sur-reply (Pl.'s Sur-reply at 1-2), however, the Complaint explicitly alleges that she was subjected to a hostile work environment (Compl. ¶¶ 77, 82, 107, 123) and Defendants have moved for summary judgment on the merits of this claim. The Court concludes that this argument lacks merit.

- Although she does not golf or shoot clay pigeons, she nonetheless expected to be invited to such outings that were not Northwest Bank-sponsored events, and other women who did golf and shoot clay pigeons did participate.

- While Reese claims she was excluded from meetings, she was invited to and attended the Central Region's year-end meetings where she received several awards and was provided with time to present to the group in attendance.

- Reese and other business partners were not invited to the Western Advisory Board Christmas meetings.

- Reese claims that she was not permitted to attend the Eastern Advisory Board meetings, but she rarely attended the Western Advisory Board meetings and was scheduled to present at the Eastern and Western Advisory Board meetings in 2019.

- Reese identifies four women in the Central Region who she believes were harassed and undermined but offered no evidence in support of this assertion.

- Reese merely identifies "offensive utterances" by Bender and McAndrew, not proof of intentional discrimination.

In her response, Reese argues that there is sufficient evidence of conduct from which a jury could conclude that she was subjected to a hostile work environment by the Individual Defendants. This includes the conduct of Bender and McAndrew, who wanted her to be fired and ridiculed her to subordinates and co-workers. They also tried to isolate and exclude her, prevented her from getting information to do her job and excluded her from meetings. Reese also claims that they manufactured issues to cause Rockey to be displeased with her, resulting in a less favorable review and the imposition of discipline. In short, Reese alleges that there are sufficient facts in the record that "McAndrew and Bender secretly plotted Reese's termination and worked towards that result." (Pl.'s Br. Opp'n at 13-14) (record citations omitted.)

Reese also points to evidence to support her contention that Bender and McAndrew harbored animus against her based on her gender. This includes their actions to operate the Central Region as a "boys club" in which men were treated better than women and "older

women were particularly under the microscope"; their perception of Reese as "dominant," "outspoken," "assertive," too proud of her own abilities, and a person who should be "knock[ed] down a few pegs" and "put in her place" despite her successful 32-year career with Northwest Bank during which she as known for being helpful and supportive of others; their annoyance when she spoke at meetings; and the fact that they were the subject of documented complaints of gender discrimination by other women. (*Id.* at 14-15.)

As discussed below, while Reese's evidence is appropriately considered in connection with her claim of sex discrimination, it does not support a claim of a sexually hostile work environment for several reasons. First, Reese has not suggested, let alone demonstrated, that exclusion from the Advisory Board or manager meetings alone would constitute "severe" or "pervasive" harassment.[27] That she was asked to leave the afternoon sessions of manager meetings, to which business partners, including Reese, were not invited, does not constitute evidence of discrimination of any kind.

Second, Reese was unaware during her employment of most of the communications between Bender and McAndrew, such as their text and email exchanges in which they disparaged her. Similarly, her assertion that "McAndrew and Bender secretly plotted Reese's termination and worked towards that result" (Pl.'s Br. Opp'n at 14) does not, by its very nature, support a hostile work environment claim. "A reasonable person in the plaintiff's position is not one who knows what the plaintiff learned only after her employment ended or what discovery later revealed." *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014). *See also Yarnall v. Philadelphia Sch. Dist.*, 2015 WL 1456701, at *7 (E.D. Pa. Mar. 31, 2015) ("Plaintiffs

---

[27] Reese does not indicate that being excluded from these meetings deprived her of tangible job benefits, for example.

cannot rely on conduct that they were unaware of during the relevant period to demonstrate that their workplace was objectively or subjectively hostile.")[28] The comments of McAndrew and Bender about her to Rockey that allegedly influenced his review of her performance are relevant to her sex discrimination claim, but not a hostile work environment claim.

That she was placed on administrative leave on August 5, 2019 is not evidence of a hostile work environment claim because it was a discrete incident. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (distinguishing between discrete acts which are individually actionable—including a wrongful suspension—and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim).[29]

Reese has also failed to respond to Defendants' argument that some incidents on which she appeared to rely, such as not being invited to golf outings, shooting events and holiday get-togethers, are not actionable, either because they are not supported by the record or because they do not rise to the level of actionable conduct. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 280 (3d Cir. 2001) (simple teasing, offhand comments and non-serious isolated incidents are insufficient). Thus, these incidents cannot be used or relied on as support for Reese's hostile work environment claim.

Finally, although Elizabeth Walker's affidavit describes her own situation (like Reese's evidence), the matters described would relate to a claim of sex discrimination, rather than a sexually hostile work environment claim. In addition, even if Walker's declaration described

---

[28] Although Reese cites *Cotter v. American Bridge Co.*, 2021 WL 927521, at *3 (W.D. Pa. Mar. 11, 2021), in support of her position, no hostile work environment claim was made in that case.

[29] Defendants also argue that, as a discrete incident, being placed on <u>paid</u> administrative leave is not actionable because by definition it did not change her "compensation, terms, conditions, or privileges of employment." *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

evidence of a sexually hostile work environment, for Reese to rely on it, she would have to proffer "some evidence that [she] was subjectively aware of the discrimination or harassment allegedly directed at her fellow employee[] at some point during the course of her employment." *Hargrave v. County of Atlantic*, 262 F. Supp. 2d 393, 421 (D.N.J. 2003) (citation omitted).

Therefore, Defendants' motion for summary judgment will be granted with respect to the hostile work environment claims in Counts I and III.

### b.  *Claims Relating to Reese's Termination*

Reese alleges that she was terminated based on her sex in violation of Title VII and the PHRA, respectively.[30] Defendants counter that her termination was based on her conduct during the August 1, 2019 meeting. To the extent that she contends that she was treated differently based on her sex, they contend that because her alleged male comparators did not engage in similar conduct and reported to different supervisors, they were not similarly situated.

Under the *McDonnell Douglas* framework, Reese has established a prima facie case of sex discrimination related to her termination. She is a woman who was qualified for and had been performing her position with favorable review for many years and was terminated under circumstances that raise an inference of discrimination. She points to five men who engaged in what she characterizes as conduct similar to or more serious than the conduct of which she was accused but received more favorable treatment. This is enough to establish a prima facie case. *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) (inferences regarding Black and white employees receiving different treatment was sufficient at prima facie

---

[30] Defendants argue that, to the extent Reese is raising a sex discrimination claim based on the March 1, 2019 NDA, she cannot do so because it was not an adverse employment action. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (defining an adverse employment action as one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.") Reese does not address this issue in her response and thus it appears that she has abandoned this claim.

inquiry, but at the pretext stage "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity.")

The burden of production thus shifts to Defendants to articulate a legitimate, nondiscriminatory reason for Reese's termination. They point to her behavior at the August 1, 2019 meeting, which was reported as threatening by Bender and McAndrew and corroborated by Rockey. This evidence satisfies their relatively light burden of production. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).

The burden then shifts back to Reese to proffer evidence from which the trier of fact could conclude that this proffered reason for terminating her employment is a pretext for unlawful sex discrimination. Reese proceeds along "*Fuentes* prong one" by arguing that she has submitted evidence from which a factfinder could reasonably disbelieve Defendants' articulated legitimate reason. *Keller v. ORIX Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). She also proceeds along "*Fuentes* prong two" by arguing that she has proffered evidence that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Keller*, 130 F.3d at 1111. A plaintiff can satisfy the second prong by demonstrating, among other things, that "the employer treated other, similarly situated persons not of his protected class more favorably." *Fuentes*, 32 F.3d at 765. The test is "disjunctive" and either prong is sufficient; all of the evidence must be considered as a whole. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009).

As the Supreme Court has made clear, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). The court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Id.* at

151. Thus, Defendants' claim that Bender, McAndrew and Rockey all agreed on what happened at the August 1, 2019 meeting is not dispositive because Reese disputes their story.

Reese focuses on the treatment of five male employees at Northwest Bank who she claims engaged in the same or more serious behavior but received more favorable treatment.[31]

### Michael Caffrey

In 2019 and 2020, Northwest received complaints about an employee named Michael Caffrey ("Caffrey"). (PCSMFPSJ ¶ 213.)[32] Crissey testified he knew of these complaints, supervised the HROs handling them, and "may have" had involvement in deciding them. (*Id.* ¶ 214.) Caffrey engaged in "serious outbursts" over an eight-month period, including "swearing, yelling, smacking the desk, throwing things," and stating he could "kill someone." He was the subject of three Lighthouse Complaints (including one which stated that employees feared for their safety), three emails from two managers and a letter at the direction of an attorney. Caffrey only received a written reprimand. *See* PCSMFPSJ ¶¶ 215- 226.

### Jeff Cramer

In September 2017, Crissey learned of ongoing professionalism concerns about Jeff Cramer ("Cramer"). Jeff Cramer engaged in "verbal attacks," "screamed abusively," "yelled obscenities" and intimidated employees. Cramer was referred to Northwest Bank's EAP instead

---

[31] In addition, as Reese notes in her discussion of the breach of contract claim (Pl.'s Br. Opp'n at 34), Defendants' statement that she "took over a meeting to discuss a personal matter" is not accurate. Construing the facts in her favor, she asked for permission to discuss her performance review. Further, Defendants' November 26, 2019 letter informs Reese that "[p]rogressive discipline has been ineffective in correcting your behavior" (ECF No. 49-1 at 138) despite their position that they "unchecked the box" on the March 1, 2019 NDA indicating a violation of company policies and procedures.

[32] Defendants state that Caffrey was "a commercial relationship manager" with different responsibilities than Reese. (DCSMF ¶¶ 197-98.) Reese responds that all employees are subject to the same policy, that her position was equivalent to Caffrey's and that Crissey supervised the handling of both complaints. (PRDCSMF ¶¶ 197-98.)

of discipline. (PCSMFPSJ ¶¶ 229-38.)[33]

### Michael McAndrew

In 2016, McAndrew was investigated for, among other things, favoritism towards male employees, losing his temper, threatening an employee, and discouraging employees from reporting to HR. At least six women complained about McAndrew, including having favorites, and reported a "good old boy network" and "favoritism" of "guys."[34] McAndrew was never disciplined. (*Id.* ¶¶ 249-50.)

Defendants respond that complaints against McAndrew were brought forward falsely and exaggerated, and therefore, many complaints were determined to be unfounded. (DRPCSMFPSJ ¶ 246.)

### Doug Bert

Moore's office adjoined that of Doug Bert ("Bert"), who handled insurance services. (PCSMFPSJ ¶ 253.) Moore testified that Bert was "very volatile," that she heard a lot of "yelling, crashing, banging," and that he often yelled at others. (*Id.* ¶¶ 252-53.) Although Bert's "volatile tendencies" were "well known," Moore did not report him because she thought nothing would be done about it. (*Id.* ¶¶ 255-57.) Defendants respond that while Moore responded affirmatively when asked about Bert's "volatile tendencies" being well known, there is no other evidence to that effect. (DRPCSMFPSJ ¶ 255.)

---

[33] Defendants assert that "The evidence Reese cites does not support the contention in Paragraph 229." (DRPCSMFPSJ ¶ 229.) Reese cited page NWB004408 (which is not included in the record), but the quotes are taken directly from page NWB004407, which is in the record.

[34] Defendants state that "The evidence Reese cites does not support the contention in Paragraph 243." (DRPCSMFPSJ ¶ 243.) Reese cited Crissey's deposition at page 126, but the actual quote appears on page 124.

### Tom Meneo

In 2018, Tom Meneo ("Meneo"), a mail operations employee, said he was thinking of "joining ISIS" and would "make a good assassin" and made comments that Crissey admitted could be "threats of violence." Although Meneo's remarks could be interpreted as threats of violence, he was not disciplined. (PCSMFPSJ ¶¶ 258-62.)[35]

In August 2020, during the COVID-19 pandemic, Meneo advocated that enforcers of mask mandates "should be shot" and said he "wouldn't mind putting a bullet in their heads myself." (PCSMFPSJ ¶¶ 263-64.)[36] In its investigation, Northwest Bank did not ask whether Meneo had guns or access to guns. (*Id.* ¶ 267.) Meneo was placed on administrative leave, issued a written reprimand, and allowed to return to work. (*Id.* ¶ 265.) Meneo served a brief suspension—a day and a half—but kept his job. (*Id.* ¶ 266.)

### Brian Leavy

In December 2018, Brian Leavy ("Leavy")[37] was counseled on professionalism. (PCSMFPSJ ¶ 271.) In July 2019, Leavy was reported for additional misconduct. Leavy admitted to being angry, raising his voice, clenching his fists, and turning red. (*Id.* ¶¶ 272-73.) Coworkers reported that he slammed and threw objects. (*Id.* ¶ 273.) Northwest Bank received reports that Leavy threatened a coworker, Charlene Hoover ("Hoover"). (*Id.* ¶¶ 273-77.) At least

---

[35] Defendants state that Meneo was a mailroom clerk whose job differed from Reese's. (DCSMF ¶ 202.) Reese responds that all employees are subject to the same policy and that Meneo's behavior involved threatening coworkers and failing to promote a positive work environment. (PRDCSMF ¶ 202.)

[36] Defendants concede this statement, but contend that of the three employees interviewed, one did not hear Meneo make the comments and the other two indicated that they did not feel threatened by Meneo's comments. (DRPCSMFPSJ ¶ 264.)

[37] Defendants state that Leavy was not a business partner, but "a floating Personal Banker, which is not equivalent to the CMA position that Reese held." (DCSMF ¶ 190.) Reese responds that all employees are subject to the same policy. (PRDCSMF ¶ 190.)

one co-worker was afraid of him and wondered if he had a gun. (*Id.* ¶¶ 276-278.)[38] Nonetheless, no one at Northwest Bank asked whether Leavy had access to guns. (*Id.* ¶ 278.) Leavy was not placed on administrative leave during the investigation. (*Id.* ¶ 279.)

In late August, 2019, Northwest HR issued Leavy a written reprimand and assigned him courses for "leveraging emotional intelligence" and "navigating other people's emotions," and transferred him to a different job. (PCSMFPSJ ¶ 280.) He received another written reprimand on September 28, 2020 for policy violations and insubordination. (*Id.* ¶ 281.) After reassignment, Leavy's new manager reported many problems over a three-month period and the Bank fired Leavy. (*Id.* ¶ 282.)[39]

Defendants contend that none of these men are proper comparators because they held different positions, reported to different supervisors and/or engaged in less serious conduct. They claim that the complaints against McAndrew were dismissed when it was discovered that the HRO investigating the incidents engaged in improper conduct, Bert's conduct was never reported and Leavy received the same discipline as Reese—he was placed on administrative leave and subsequently terminated.[40] That said, Defendants concede that Leavy was not placed

---

[38] Defendants respond to this statement as follows: "Disputed on the basis that there is no evidence cited in support of the contention set forth in Paragraph 277." (DRPCSMFPSJ ¶ 277.) Although this is technically true (Reese forgot to include a citation), the quotation can be found a few pages after the previous one on page NWB009803.

[39] Reese states that many of Leavy's later problems had nothing to do with threatening behavior (PCSMFPSJ ¶ 282), which seems to undermine her argument that men who engaged in behavior similar to hers received better treatment. On the other hand, Defendants contend that Leavy's new supervisor also noted his aggressive behavior (DRPCSMFPSJ ¶ 282), which seems to undermine their denial of Reese's assertion that men received second chances while women did not.

[40] In Defendants' reply brief, they state that Cramer was not a CMA and did not report to Rockey. Their argument that "there is no evidence that McAndrew, Cramer, and Bert had prior disciplinary history and counseling related to inappropriate and unprofessional conduct like Plaintiff did" (Defs.' Reply Br. at 6) is circular reasoning: Reese's point is that they engaged in similar or worse behavior and did not receive discipline like she did.

on administrative leave during the investigation (DRPCSMFPSJ ¶ 279).[41] And there are material issues of disputed fact as to the reasons for Leavy's ultimate termination. As for Bert, Moore, an HRO, was personally aware of his "volatile tendencies" and Defendants have not explained what further reporting would have been necessary. Reese also argues that the jury could infer from Moore's conclusion that "nothing would have been done" even if his conduct had been reported as evidence that males would not be punished for the same acts that she was accused of committing.

As the Third Circuit has stated, "comparator employees need not be identical in 'all material respects.'" *Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024) (citations omitted). Factors to be considered include:

> . . . whether the employees dealt with the same supervisor, were subject to the same standards, and shared similar job responsibilities. *In re Tribune Media Co.*, 902 F.3d at 403; *see also Lee*, 574 F.3d at 259-61; *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006); *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). An employee who holds a different job title or works in a different department is not similarly situated. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013).

*Qin v. Vertex, Inc.*, 100 F.4th 458, 474 (3d Cir. 2024). The Supreme Court has held that evidence offered in a discrimination case about purported comparators with different supervisors is neither per se admissible nor per se inadmissible. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 386-87 (2008).

Although Defendants argue that the comparators had different supervisors, Reese argues that this is a distinction without a difference because Crissey and the HR Department were the decision makers in all cases. She also notes that she was the only CMA in the Central Region and "where a plaintiff occupies a unique position within an organization . . . a standard requiring

---

[41] The actual record regarding Leavy states that he received a "written reprimand." (Pl.'s Ex. 58 at NWB009470.)

identity would eviscerate a plaintiff's ability to employ comparator evidence to make a case of prima facie discrimination, and instead require the plaintiff to produce direct evidence of discrimination. The law makes no such demand." *Williams v. Bala Ret. & Nursing Ctr.*, 2007 WL 2571526, at *5 (E.D. Pa. Aug. 31, 2007) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352-53 (6th Cir. 1998)).

Defendants argue that the August 1, 2019 incident was not the first time Reese engaged in sanctionable conduct. However, Reese argues that Crissey acknowledged that generally, Northwest Bank would only look back "a couple of years" for previous discipline (PCSMFPSJ ¶ 209). In her case, however, it looked back to 2013 (before she was a CMA and for totally unrelated conduct).[42] And, as outlined above, some comparators engaged in sanctionable conduct multiple times but were not terminated.

Defendants also contend that Reese "ignores the undisputed fact that Northwest Bank terminated the employment of approximately 29 other employees (both male and female) who were found to engage inappropriate, unprofessional, threatening, and/or violent conduct between January 2017 and May 2021." (Defs.' Reply Br. at 6.) As Reese notes, however, the spreadsheet Defendants cite to support this argument (Pl.'s Ex. 58) contains no details about the conduct or progressive discipline that was imposed. Therefore, it cannot be determined from this evidence whether Reese was treated the same or more severely than her male counterparts.

Reese's claims are not foreclosed because Bender and McAndrew were not the decision markers. In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), a case brought under the Uniformed

---

[42] Defendants argue that Crissey also testified that "that could become circumstantial depending upon the nature of the previous discipline, the egregiousness of the previous discipline, and the circumstances surrounding the current issue that you're working on." (DRPCSMFPSJ ¶ 209.) However, they have not pointed to any testimony by Crissey that Reese's prior conduct justified reaching back in time as he did, or that the comparators presented less serious situations.

Services Employment and Reemployment Act of 1994 (USERRA), the Supreme Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 422 (footnotes omitted). Such a situation invokes the "cat's paw" theory of liability.[43] The Court of Appeals has applied this reasoning to cases under Title VII, *McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011), and the PHRA, *Macknet v. University of Pa.*, 738 F. App'x 52, 57 (3d Cir. 2018).

Thus, the fact that Bender and McAndrew were not the decision makers and lacked authority to terminate Reese does not preclude Northwest Bank for being held liable for their actions if they were the proximate cause of Reese's termination.[44] *See Chase v. Frontier Commc'ns Corp.*, 361 F. Supp. 3d 423, 448 (M.D. Pa. 2019) ("At the summary judgment stage, a plaintiff advancing a cat's paw theory based on alleged retaliatory or discriminatory animus of a nondecisionmaker must establish that there is a genuine issue of material fact as to (1) the animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action.")

---

[43] The name comes from upon Aesop's fable of the monkey who induces a cat by flattery to extract roasting chestnuts from the fire, and the cat does so, burning its paws in the process and the monkey makes off with the chestnuts and leaves the cat with nothing. *Id.* at 415 n.1.

[44] Although the Supreme Court spoke only in terms of "supervisors," several courts of appeals have held that liability may be asserted when "nonsupervisory coworkers: (1) performed an act motivated by discriminatory animus; (2) the act was intended by the coworker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action, and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation; or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation." *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 738-39 (E.D. Pa. 2014) (citing *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014)). *See also Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273-74 (2d Cir. 2016).

Contrary to Defendants' contention, there is sufficient evidence of their actions here to establish proximate cause: the Individual Defendants clearly had animus against Reese which may have been based on her failure to conform to gender stereotypes; their story about what occurred at the August 1, 2019 meeting changed over time and ultimately portrayed Reese as a dangerous threat to their safety; and Crissey (the decision maker) relied on their written statements (and never obtained one from Reese) to conclude that Reese had to be terminated rather than progressive discipline.

As to the actions of Bender and McAndrew, the fact that Reese was unaware of all of their conduct at the time does not prevent her from relying on this evidence now to support her claims. Defendants argue that their comments show merely that they disliked Reese, not that their attitudes were based on her sex. However, as Reese notes, a jury could conclude that they displayed stereotypical opinions that Reese was not conforming to traditional roles for women: she was outspoken, "pushy," did not defer to men, and so forth. As noted above, discrimination "because of sex" includes a claim that an employee was discriminated against because of her failure to adhere to or comply with gender stereotypes. *Bibby*, 260 F.3d at 263.

Therefore, with respect to Reese's sex discrimination claims arising out of her termination as asserted in Counts I and III, Defendants' motion for summary judgment will be denied.

### 3.  Age Discrimination Claims

In Count II, Reese alleges that she faced age discrimination in violation of the ADEA based on the CTP exam issue, a hostile work environment and her termination. She alleges the same claim under the PHRA in Count III. Defendants move for summary judgment with respect to all of these claims. Reese now withdraws her ADEA/PHRA claims as to her termination and a

hostile working environment. (Pl.'s Br. Opp'n at 23 n.9.) However, she maintains that the Bank's refusal to allow her to take the CTP test and Rockey's comments are sufficient to maintain these claims.

Defendants argue that they did not prevent or even discourage Reese from taking the CTP exam. Rather, they contend that because it was her own actions that led to her failure to take it, they are not liable. Reese responds that the evidence about this issue is disputed and that, viewing the facts in her favor, she has adequately supported a claim of age discrimination as it relates to the CTP exam.

A factfinder might conclude that Rockey's comments about Reese's age and the CTP test were merely recalling Walker's recommendation that employees not wait too late in their careers to take the test. Alternatively, however, these comments could be interpreted as expressing an attitude of age discrimination. And while Defendants contend that Rockey was fully supportive of Reese taking the CTP test and she was the one who kept delaying the process, Reese has argued that Rockey did not help her get this accomplished but responded to her raising of the issue by telling her that she should not take the test if she was within ten years of retiring, which even Payne acknowledged "went to age." Drawing all inferences in Reese's favor as the non-moving party, as the Court must do at this stage of the proceedings, this claim survives summary judgment. Therefore, solely with respect to age discrimination claims in Counts II and III as they relate to the CTP test, the motion for summary judgment will be denied. It will be granted in all other respects.

### 4. Retaliation Claims

Reese asserts claims of retaliation under Title VII (Count I), the ADEA (Count II) and the PHRA (Count III). Defendants move for summary judgment with respect to all of these claims.

A prima facie case of retaliation requires showing: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quotation omitted). The causal connection may be shown based on "unusually suggestive" temporal proximity or a pattern of antagonism. *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Defendants contend that the only protected activity on which Reese can rely are her May 7, 2019 complaints to Crissey and her August 12, 2019 EEOC charge, both of which are too far removed from her November 26, 2019 termination to be causally related. Reese responds that she repeatedly engaged in protected activity: on August 1, 2019, when she told Rockey, Bender and McAndrew that she was being subjected to a hostile work environment; on August 7, when her counsel contacted Northwest Bank's counsel; on August 12, when she filed an EEOC charge; and August 15, when Laws received a copy of her EEOC charge.

She notes that, on August 1, the Individual Defendants reported her to HR and the next day and again on August 7, they exaggerated their "concerns" to get her fired; that on August 16, she was "unofficially fired" and that, on November 26, the day of the unsuccessful mediation, she was officially terminated. *See Erbe v. Potter*, 2010 WL 1052947, at *4 (M.D. Pa. Mar. 22, 2010) (participating in the EEO process through mediation "constitutes protected activity and satisfies the first prong of his prima facie case.")[45] Reese has stated a prima facie case of

---

[45] In their briefs, Defendants assert that it was a "private (non-EEOC directed) mediation" (Defs.' Br. at 8; Reply Br. at 8), which they then contend is not protected activity under Title VII. However, they cite no part of the record to establish this fact and no case law to support this

retaliation.

Again, Defendants point to Reese's behavior at the August 1, 2019 meeting as the legitimate, nondiscriminatory reason for her termination. Reese points to evidence of pretext based on continued hostility to her complaints. She argues that the jury could conclude that the Individual Defendants retaliated against her for her complaints about a hostile work environment on August 1 by manufacturing multiple statements that increasingly and inaccurately portrayed her as a dangerous, threatening employee obsessed with guns, which led to her termination.

The Court concludes that Reese has pointed to sufficient evidence of pretext. Therefore, with respect to the retaliation claims in Counts I, II and III, the motion for summary judgment will be denied.

5.  Liability of the Individual Defendants

Defendants argue that Reese has proffered no evidence of "aiding and abetting liability" for purposes of holding the Individual Defendants liable. They contend that Bender and McAndrew had no authority over Reese and that Rockey—who was her supervisor—was not involved in the decision to terminate her employment, which was made by Crissey.

Reese responds that the record contains a significant amount of evidence that could support imposing aiding and abetting liability on Bender, McAndrew and Rockey for their roles in the events leading up to her termination. She argues that Bender and McAndrew contributed to Rockey's review of her performance and that Crissey relied on the reports of all three when making the decision to terminate Reese.

Courts have emphasized that liability under § 955(e) only extends to those who are in a supervisory role as "only supervisors can share the discriminatory purpose and intent of the

---

distinction.

employer that is required for aiding and abetting." *Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 497 (M.D. Pa. 2005) (citation omitted). Direct incidents of harassment by non-supervisory co-employees are not covered by § 955(e). See *Dici v. Commonwealth of Pa.*, 91 F.3d 542, 552-53 (3d Cir. 1996).

In some circumstances, however, "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Vance v. Ball State Univ.*, 570 U.S. 421, 447 (2013). Thus, in a case in which the plaintiff utilizes a cat's paw theory of liability, employees upon whose recommendation an employer relies can be held liable. *See Howell v. Millersville Univ. of Pennsylvania*, 2017 WL 11550630, at *3 (E.D. Pa. Aug. 21, 2017).

Reese has pointed to evidence that Rockey relied on input from Bender and McAndrew in his performance review of Reese and that Crissey, the decision maker as to her termination, relied on statements he received from Rockey, Bender and McAndrew and never interviewed her. Under these circumstances, the Individual Defendants may be held liable if the trier of fact concludes that they aided and abetted the discrimination. Therefore, they will not be dismissed from the case.

### 6. Breach of Contract Claim

In Count IV, Reese contends that the Northwest Defendants breached their contractual responsibilities to her by canceling her stock options. Defendants move for summary judgment on this claim and Reese moves for partial summary judgment in her favor with respect to the cancellation of stock options under the 2008 and 2011 incentive plans. The existence and terms of the 2008, 2011 and 2018 plans are not disputed.

"Three elements are necessary to plead properly a cause of action for breach of contract: [(1)] the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002) (citations and quotation marks omitted).

Defendants argue that it is undisputed that Reese's stock options were canceled because Crissey deemed Reese's termination to be "for cause."[46] They contend that what is disputed is whether they had a good-faith basis for this conclusion. Defendants also argue that Crissey's "practice" of deeming all involuntary terminations other than layoffs as "for cause" was "consistent with" the terms of the stock incentive plans. As the language of the plans demonstrates, however, this is not actually the case. The term "cause" is specifically defined and does not include all involuntary terminations other than layoffs. Moreover, even if it were undisputed that Crissey relied on the language of the incentive plans, the facts surrounding the cancellation of Reese's stock options are still in dispute.

Defendants rely on the provision of the 2008 and 2011 plans that states that "cause" includes: "the continuing willful failure of the Participant to perform his duties to the Company or any Subsidiary . . . after written notice thereof." Reese argues that: (1) the term "duties" is not defined in the 2008 and 2011 plans; (2) her "duties" were to partner with branch managers and other Bank staff to sell treasury products and services to Bank customers; (3) they cannot assert that she failed to perform these duties after written notice and in fact she received performance reviews of "commendable" and "distinguished" in 2018 (her last performance review prior to

---

[46] Reese relies on Defendants' citation to a provision in the 2018 plan that terminations for cause result in forfeiture of stock options, but she cannot dispute that the 2008 and 2011 plans both have a provision similarly providing that terminations for cause would result in forfeiture. It is true that the plans had different definitions of the term "cause." Whether Reese's actions constitute "cause" under the various plans is disputed.

being terminated); (4) they have improperly expanded the definition of "duties" to include "professional conduct" and promoting a "positive work environment"; and (5) they then reach back six years in time to find three unrelated occasions when she received written notices for unprofessionalism, to support their position. She also notes that, in the context of the other examples of "cause" the expansion of "duties" to include unprofessional behavior that does not promote a positive work environment cannot be justified.

Defendants have not responded to these arguments. Moreover, even if the meaning of "cause" could be interpreted as they suggest, that interpretation skews in favor of Northwest Bank, the drafter of the agreements, which is inappropriate. "As a general rule, agreements will be construed against the drafter when terms are ambiguous." *Dieter v. Fidelcor, Inc.*, 657 A.2d 27, 30 (Pa. Super. 1995) (citation omitted). Finally, Reese argues that whether she engaged in "willful misconduct" under the 2018 plan is also vigorously disputed. Viewing the facts surrounding the August 1, 2019 meeting in the light most favorable to Reese, she became emotional but did not yell, take an aggressive tone, pound the table or threaten anyone. The statements submitted by Bender, McAndrew and Rockey increasingly portrayed Reese as a gun-obsessed treat to their safety. Only the trier of fact can determine whether her behavior constituted willful misconduct.

For all the reasons cited above, the Court cannot conclude based on the record that Reese's termination satisfied the various plans' definition of the term "cause." Therefore, with respect to Count IV, Defendants' motion for summary judgment will be denied.

Reese has not established that summary judgment should be entered in her favor either. Just as the Court cannot defer to Defendants' interpretation of "cause" with respect to their motion for summary judgment, it similarly cannot defer to Reese's interpretation of "cause." In

addition, in response to her motion, Defendants noted that, according to Reese's own records, she did not have 4,680 vested shares under the 2008 and 2011 plans, or even 3,720 shares.[47] Rather, she had only 2,136 vested stock options (that she had not already exercised) under the 2008 and 2011 plans as of November 26, 2019. (Defs.' Br. Opp'n at 8.) Reese acknowledges that this is accurate. (Pl.'s Br. Opp'n at 33 n.13.)

       7.  <u>WPCL Claim</u>

In Count V, Reese alleges that the Northwest Defendants violated the WPCL by canceling her stock options, which entitles her to lost wages, attorney's fees and liquidated damages. As with Count IV, the parties have filed cross-motions for summary judgment as to this claim.

The WPCL "does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990) (citations omitted).

The WPCL defines "wages" as including "fringe benefits," which encompasses "any other amount to be paid pursuant to an agreement." 43 P.S. § 260.2a. For example, bonuses, commissions, and stock options are "wages." Thus, if an employee shows that any "amount to be paid pursuant to an agreement" "remain[s] unpaid," then that employee may be entitled to liquidated damages. 43 P.S. §§ 260.2a, 260.10. *See Braun v. Wal-Mart Stores, Inc.*, 24 A.3d 875, 961-62 (Pa. Super. 2011), *aff'd*, 106 A.3d 656 (Pa. 2014).

---

[47] In her brief, she mentioned the cancellation of 4,680 shares (Pl.'s Br. at 3.) However, her calculations in Paragraph 43 of her Concise Statement add up to 3,720 shares for a total loss of $14,087.00.

For the reasons described above as to the breach of contract claim, neither Reese nor Defendants are entitled to summary judgment with respect to the WPCL claim because there are disputed issued of fact about whether Defendants terminated Reese for "cause." Therefore, both motions for summary judgment will be denied. As a result, the Court will not reach Reese's additional arguments that she is entitled to lost wages, attorney's fees and liquidated damages, nor will it reach Defendants' argument that, even if Reese were entitled to summary judgment on the WPCL claim, she could not collect liquidated damages because she has not established that there was no good-faith dispute justifying the Bank's cancellation of her stock options.

## V.  <u>Conclusion</u>

For these reasons, Defendants' motion for summary judgment will be granted with respect to Plaintiff's claims of a hostile work environment in Counts I and III and her claims of age discrimination as to her termination and hostile work environment under the ADEA and PHRA, but denied in all other respects. Plaintiff's motion for partial summary judgment with respect to Counts IV and V will be denied.

Appropriate orders will follow.

Dated: August 27, 2025                              s/Patricia L. Dodge
                                                    PATRICIA L. DODGE
                                                    UNITED STATES MAGISTRATE JUDGE